JOHN CULBERTSON v. WILLIAM J. YOUNG AND JAMES M. DARRAH.

*Chattel mortgages—foreclosure—bill to redeem.*

The assignee of a chattel mortgage securing a number of notes, transferred some with a power of sale, but retained a junior interest in the mortgage much larger than that which he transferred. The transferee foreclosed without actual notice to the holder of the junior interest; and with no other notice to the public than by posting notices the night before the sale and tearing them down immediately afterwards, the property was sold in bulk, and not in parcels, to purchasers who were in collusion with the mortgager, for very much less than its actual value, which was sufficient to cover the whole debt. *Held* that the assignee holding the junior interest should have had actual notice of the sale, and that he could maintain a redemp-

tion bill against the foreclosure purchasers, and under the general prayer therein have them account to him as trustees in their own wrong, and obtain payment from them of the notes secured by his interest in the mortgage.

Appeal from Mecosta.    (Fuller, J.)    Jan. 18.—Feb. 27.

REDEMPTION bill.    Complainant appeals.    Reversed.

*Dallas Boudeman* for complainant.    A foreclosure sale under a chattel mortgage is fraudulent and void as against a person possessing a junior interest under the mortgage if made by collusion, and without notice with intent to secure the property at a small sum:  Bump Fraud. Conv. 257; Jones Chat. Mortg. § 802; 2 Jones Mortg. §§ 1909–1913; *Longwith v. Butler* 8 Ill. 40; *Morris v. Allen* 10 Ired. 203; *Kilby v. Haggin* 3 J. J. Marsh. 208; or if made in bulk when a portion would have sufficed:  Jones Chat. Mortg. § 797; *Brink v. Freoff* 40 Mich. 610; *Botsford v. Murphy* 47 Mich. 537; especially if the power of sale authorizes sale of only so much as need be sold to satisfy the claim:  Jones Chat. Mort. 504; *Emmons v. Dowe* 2 Wis. 322; the right of a mortgager or second mortgagee of chattels to file a bill to redeem from sale or foreclosure exists even after the goods have been taken possession of under the mortgage:  *Van Brunt v. Wakelee* 11 Mich. 177; *Flanders v. Chamberlain* 24 Mich. 305; *Lucking v. Wesson* 25 Mich. 445; *Hungate v. Reynolds* 72 Ill. 425.

*W. W. Carpenter* and *M. Brown* for defendants.

GRAVES, C. J.    This is a redemption bill concerning personal property, and it was filed January 2, 1877.    Joseph L. Escott was also a defendant originally, but as against him it was dismissed on demurrer in June, 1877, and he disappeared from the case.    In February, 1877, the remaining defendants Young and Darrah jointly answered and incorporated the common averment that complainant's remedy was at law.    Proofs were taken and on August 25, 1882, the court dismissed the bill.

A sketch of the facts or a portion of them is necessary to an understanding of the controversy.

March 10, 1876, one William Culbertson was engaged in merchandising at Big Rapids, and on that day he sold out his stock to William W. Putnam and George Clayton for $3600, which was no more than the fair value and was probably considerably less.

To secure the consideration Clayton & Putnam gave him their promissory notes, eighteen in number, for $200 each and payable respectively on the tenth of each month, beginning in April, 1876, and ending in September, 1877, and all drawing interest at ten per cent. from April 10, 1876. At the same time the vendees executed to him their chattel mortgage on the property to secure the notes and it was duly filed. It contemplated that Clayton & Putnam might retail from the stock and from time to time replenish in the manner usual where such merchandising is legitimately conducted, and that the mortgage should apply to all new articles so introduced. It provided also that in case of default in payment the mortgagee should sell at public auction after the like notice prescribed by law on constable's sales, the whole or so much of the property as should be necessary to satisfy the debt, interest and reasonable expenses, and after retaining this, to pay the balance to the mortgagors.

The bargain being finished, Clayton & Putnam jointly and as partners proceeded to merchandise with the stock, but the changes from sales and new purchases were small.

April 27, 1876, William Culbertson the mortgagee assigned the notes and mortgage to complainant and the transfer was put on file.

July 19, 1876, Putnam sold his interest in the stock to Zelotus Bloomburg, and the latter then united with Clayton and they continued the business. The first six notes were paid.

November 1st, 1876, complainant assigned to Wallace W. Carpenter, a lawyer at Big Rapids, the three notes payable in October, November, and December, 1876, retaining the nine last payable. In this transaction the complainant was

represented by his assignor, William Culbertson, and Mr. Carpenter gives this explanation of it. He says he had obtained a judgment in favor of certain creditors against William Culbertson for $300 and costs, and had filed a creditor's bill and enjoined payment of the notes. That he proposed to William Culbertson to assign the notes first due and unpaid and get rid of the injunction. That the latter replied that payment was also enjoined in another case for about $160, and that he, Carpenter, then proposed to pay that himself in order to effect an arrangement and secure collection of the first demand, and that this proposal was acceded to. But that it was then ascertained that the attorney who controlled the second case would not give way unless a justice's judgment in his hands for the further sum of fifty or sixty dollars was also provided for. That it was then agreed that he, Carpenter, should pay these last demands and cancel the first, and that William Culbertson as complainant's representative should assign the three notes and the security for them in the mortgage, and that in pursuance of this arrangement the notes and mortgage were turned over to him.

The assignment was as follows:

"For value received, I do hereby sell, assign and set over unto Wallace W. Carpenter, of the city of Big Rapids, Mecosta county, Michigan, six hundred dollars and the interest thereon of a certain chattel mortgage, executed by George S. Clayton and William W. Putnam, of said city, to William Culbertson, and bearing date March 10, 1876, for thirty-six hundred dollars, which said chattel mortgage and notes were duly assigned by the said William Culbertson to me April 27, 1876, together with the note due October 13, 1876, of two hundred dollars and interest; also the note of said sum to become due November 13, 1876, and interest; and the third of same sum and interest due on the 13th day of December, 1876, hereby giving said Wallace W. Carpenter full authority therein, in his own name or otherwise, to enforce same by foreclosure of said mortgage or otherwise; said assignment of said portion of mortgage to take priority over the remainder of said mortgage, the balance of said chattel mortgage being subject to

the full payment of said six hundred dollars and interest as aforesaid.

Witness my hand and seal this first day of November, 1876.

                         JOHN CULBERTSON.     [ L. S. ]

By WILLIAM CULBERTSON, his Attorney."

Complainant resided in St. Joseph county. The defendants were merchandising in the store adjoining Bloomburg & Clayton. December 13, 1876, Mr. Carpenter obtained from the latter the following paper: "We are unable to meet the notes now due under the Clayton & Putnam chattel mortgage, and therefore do hereby surrender and deliver up to W. W. Carpenter the possession of the stock covered by said mortgage. *Dated December* 13, 1876. BLOOMBURG & CLAYTON."

Nothing was then done to interfere with the possession except the giving of this paper. The establishment remained open with business going on as usual. No act occurred to suggest to the public or to third persons that any change had ensued or was meditated. Six days later the sheriff was called in by Mr. Carpenter to sell the old stock on the mortgage and it was struck off to the defendants. The nine notes of complainant were wholly unpaid and have so remained. He had no notice in fact that any proceedings had been taken to foreclose and did not become aware of the sale until after its occurrence, and he charges "that said pretended foreclosure and sale was wholly illegal and void; no notices of said sale were legally and properly posted and that said sale was made secretly and fraudulently, and the whole of said goods were sold in one lot and were not sold in parcels or in a manner to bring the largest price, and that they were all struck off to the said Young & Darrah at one bid and for the pretended sum of $451 when said goods were actually worth more than three thousand dollars."

That the bill stated a case for equitable cognizance is too clear to be questioned for a moment, and the only thing to be settled is whether under the proofs and admissions a basis for relief is made out either under the special or general prayer. The answer admits that the whole stock was sold in a lump and for the round sum of $451, and according

to the weight of evidence it was worth nearly if not quite $3000.

Mr. Young, one of the defendants, and who acted in the transaction for his firm, had previously talked with Bloomburg & Clayton about bidding off the goods and had received from Mr. Carpenter information of the amount of his claim which was $450. The store was still open as it had been, and to all appearance the business was going on there in the usual way, and no one except the actual parties immediately concerned seem to have had any idea that a sale was to take place. About ten in the forenoon Mr. Carpenter called on the sheriff, Mr. Escott, to conduct the proceedings, and the latter in company with that gentleman and defendant Young and an attorney who casually went with them, repaired to the store. Another gentleman went in and immediately stepped out. Mr. Bloomburg was in and engaged as usual in waiting on customers. No others were present. Hence it would seem that the only persons there who in any proper sense could be considered as attendants at the sale were Mr. Carpenter and defendant Young. The old stock was distinguishable from the new goods by a particular mark and Mr. Bloomburg pointed out that stock and the sheriff sold it in one lump. A package of prints was lying on the counter and it was first offered, but no bid being made some one suggested to put up the whole together as there was no bid for small parcels and that course was immediately adopted. Mr. Carpenter bid $450, the exact amount of his claim, and Mr. Young then bid $451 and the entire stock was struck down to him. The whole transaction was completed in from fifteen minutes to half an hour, and immediately on its close Mr. Escott in his character of sheriff seized the other or new goods on an attachment against Bloomburg & Clayton and subsequently sold them on an execution in the same case to defendants for $164.81. The defendants deny having made a prior purchase from Bloomburg & Clayton, and on the theory of the defense they acquired the whole stock, both new and old,

for $615.81, being less than one-third of its value on their own representation.

Assuming that the price thus paid for the new goods on the judicial sale was something near their value, the conclusion is unavoidable on the evidence that the stock sold on the mortgage must have been worth more than $3000.

We may next refer to evidence touching some of the preliminaries to the mortgage sale and concerning a few other matters having a bearing. Mr. Woodward, a clerk of defendants, had been occasionally employed by Mr. Carpenter to write for him a little, and being handy, that gentleman called on him late in the afternoon of December 13th to put up three notices of the sale. He put them up about seven o'clock in the evening, which was after dark. But in the course of the same evening they were all torn down, and this constituted the sole notification of the sale. Clayton, one of the mortgagors, and Bloomburg, his partner and successor of the other mortgagor, swear positively that several days prior to the mortgage sale they made a secret transfer of their interest to defendants and that the latter had it in contemplation in order to complete the title and get the whole property, to bid off the old stock on the foreclosure, and that it was arranged between them and Young that matters at the store should be so conducted as to preclude suspicion that any change was in prospect and that the measures for the sale should be so managed as to avoid publicity and facilitate the obtainment of the property at the lowest price; that as conducive to this end Bloomburg should stay and sell as usual until the sale and that the notices should be destroyed immediately after being put up, and that this scheme was actually carried out; that in pursuance of it Bloomburg did remain and continue selling, and assisted in tearing down the notices, one being torn down by him, the second by Clayton and the third by some one else not positively identified.

Young denies, as already stated, that his firm purchased of Bloomburg & Clayton prior to the mortgage sale, and also denies that he was a party or privy to the scheme

described by Bloomburg & Clayton. But the fact that the notices were posted up after dark by defendant's clerk and actually torn down the same night is not controverted, and it is admitted that there were negotiations between Young and Bloomburg & Clayton before the mortgage sale for the purchase of their interest, and that Young intended to bid off the property on the foreclosure and received from Clayton several days before that sale the key to the store, and that in the mean time Bloomburg remained there and continued selling, and that defendants sent some customers in, whose accounts were kept by defendants on a spindle with a view to future adjustments.

It seems to the Court that it would be a waste of time to go into further detail or to discuss equities or cite authorities. The case upon its own broad facts, it seems to us, is plainly with the complainant, and on well-acknowledged principles. The power of sale was to be exercised according to its proper sense and with an honest and careful regard for the rights and interests of all concerned. This was true both in regard to notice and publicity, and in regard to the mode of sale itself.

Complainant was holder of the last nine notes together with a junior interest in the mortgage, and he was hence very largely interested as a creditor of the fund, and had foreclosure been attempted in equity on account of these prior notes he would have been a necessary party, and in view of his interest and its nature, and of the equity between him and Carpenter, and of the circumstance that it was entirely practicable, it is the opinion of the Court that Carpenter was bound to give him actual notice of the sale under the power.

In the next place the conclusion from the weight of evidence is unavoidable that Young and the mortgagor Clayton and his partner Bloomburg actually and designedly co-operated in acts to suppress notice of the sale and keep it secret, and as a means to enable the defendants to get the goods for a pittance of their value and despoil complainant of all his security. The actual proceedings at the sale cor-

responded with the antecedent steps. The occasion was prepared to insure the desired result. Nobody was present to disappoint the design. The intent of the power contained in the mortgage and the equity of complainant as holder of the junior interest in the fund, were equally violated.

The manner of sale plainly intended was one which would be fairly expected to do the best for the fund, and at the same time not involve a sale of portions not at all necessary to raise the requisite amount. It was therefore contrary to the purpose of the mortgage and in derogation of complainant's rights to sell the whole stock in bulk and not in parcels. It would be an affront to common sense to say that a fair proceeding and fair sale in parcels, so far as necessary to satisfy the demand held by Carpenter, would have consumed more than one-third of the property. By the means which have been explained the defendants got possession of the whole fund, and as between themselves and complainant they made themselves chargeable with it in equity and became trustees in their own wrong and bound to account, and the evidence shows that after deducting the $451 which they paid, there was still sufficient if not more than sufficient to pay complainant, and his notes have now been long due. No circuity is necessary. The proper redress may be direct and specific.

Under the statements in the bill and the facts in evidence it is entirely practicable to decree payment under the general prayer.

The decree should be reversed with the costs of both courts, and one entered requiring the defendants to pay the notes.

COOLEY and MARSTON, JJ. concurred.